IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

GARY F. ALTENBURG

      Plaintiff,

v.                    //   CIVIL ACTION NO. 1:04CV59
                                   (Judge Keeley)

COMMONWEALTH GENERAL
CORPORATION LONG-TERM
DISABILITY PLAN,

      Defendant.

## MEMORANDUM OPINION AND ORDER
## GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

At the request of _pro se_ plaintiff Gary F. Altenburg ("Altenburg"), the Court conducted a hearing to address the defendant's "Motion For Affirmance of Administrative Determination" (dckt. no. 21). For the reasons that follow, the Court **GRANTS** the defendant's motion.

### I.    FACTUAL BACKGROUND

Altenburg worked as a Manager/Sales Agent for Monumental Insurance Agency ("Monumental") for nineteen and a half years. He participated in the Commonwealth General Corporation Long-Term Disability Plan ("Plan"). This Plan consists of a Summary Plan Description ("SPD")[1] and an insurance policy issued by Commonwealth

---

[1]Altenburg argues that he is not covered by the 1998 Commonwealth Insurance Plan SPD ("1998 SPD") submitted by the defendant. On December 16, 2004, he submitted to the Court "AEGON USA, Inc. Other Welfare Plans Summary Plan Description Effective January 1, 2000" ("2000 SPD"), which he believes is the proper SPD. The 2000 SPD is not, however, contained in the administrative record. Further, because the relevant provisions in the 2000 SPD are identical to those in the 1998 SPD, the Court's analysis is the same under either SPD.

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

Life Insurance Company ("Commonwealth"). The record indicates that Altenburg is fifty-one years of age and is married to his third wife, who recently gave birth to Altenburg's daughter.

Altenburg's medical records evidence a long history of heart disease and psychological disorders, for which he has received treatment from a number of health care providers, including cardiologists, Dr. Peter Duffy ("Dr. Duffy"), Dr. Morgan Lyons ("Dr. Lyons"), Dr. Samir Shah ("Dr. Shah") and Dr. S.M. Reddy ("Dr. Reddy"); a neurologist, Dr. Shiv Navada ("Dr. Navada"); a psychiatrist, Dr. David Colvin ("Dr. Colvin"); a psychologist, Dr. Charles M. Green; a family physician, Dr. Nancy Joseph ("Dr. Joseph"); and a vascular surgeon, Dr. Herbert Oye. Medications, such as Covera, Nitro-Dur Patch, Atenolol, Lipitor, Prozac, Norvasc, Wellbutrin, Depakote, Alprazolam, Relafen, Pletal Xalatan, Prevacid, Clonazepam, nitro pills and aspirin, have been prescribed to control these conditions.

## A.    Altenburg's Medical History

Altenburg's health problems started in 1990, when he suffered an acute inferior wall myocardial infarction (heart attack) while hunting. He underwent a cardiac catheterization ("cardiac cath"), which revealed significant blockage of his right coronary artery, and subsequently underwent an angioplasty procedure. After the angioplasty successfully dilated the artery, Altenburg's

2

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

cardiologist, Dr. Duffy, continued to examine him and urged Altenburg to discontinue his habit of smoking two packs of cigarettes a day. Physical examinations administered by Dr. Duffy gave no indication of congestive heart failure until 1995, when a stress test revealed permanent damage to the inferior wall of Altenburg's heart consistent with the area of the previous myocardial infarction. A cardiac cath revealed a 25% blockage in the right coronary artery and a 90% blockage in the left anterior descending coronary artery. Consequently, Altenburg underwent another angioplasty, which resulted in residual blockage of 20%. Although doctors considered the angioplasty to be a success, and a stress test performed in September 1995 indicated that Altenburg possessed excellent exercise capacity, a repeat cardiac cath revealed that the blockage in his left anterior descending coronary artery lesion had increased to 40%. Dr. Duffy did not recommend another angioplasty, however, because he found Altenburg to be in stable condition with only rare twinges of chest pain.

In 1996, Dr. Duffy relocated his practice and Altenburg started receiving treatment from Dr. Lyons. He also attended regular appointments with his primary physician, Dr. Joseph. In the fall of 1996 Dr. Lyons performed another cardiac cath after Altenburg complained of chest pains. The cardiac cath again revealed a 40% lesion in his left anterior descending coronary

artery and further indicated a 40-50% lesion of a third diagonal branch of the left circumflex coronary artery. According to Altenburg, Dr. Lyons filled out the American Heart Association Functional Capacity report listing Altenburg's functional capacity as between "a class 2 and a class 3" and commented that Altenburg "needs to avoid physical and emotional stress. I point out stress is not a mental disorder but an automatic, immediate. Stress can be good called Eustress When it Helps us perform better, or it can be Bad (distress) when it causes us to be upset or makes us sick." Consequently, Altenburg could not return to work and attempted to secure long-term disability ("LTD") benefits under the Plan.

**B.     The Plan's LTD Benefits**

To qualify for LTD benefits, the Plan requires an employee to meet its definition of the term "totally disabled," which it defines differently based on the nature and length of an employee's disability. For the first twenty-four months of disability, an employee must be unable to perform the substantial and material acts necessary to perform his own job in the usual or customary way, and must be under the care of a physician in order to qualify for benefits. During this initial twenty-four-month period, the Plan may require proof that an employee's total disability continues at any time. After the first twenty-four months, proof of continued disability is only requested once a year, and an

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

employee only remains eligible for benefits if he is unable to perform *any* occupation for which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, physical or mental capacity.

Generally, an employee who meets the Plan's requirements may continue to receive benefits until he reaches the age of 65; however, if an employee is disabled due to a *mental* illness, benefits are only awarded for a maximum of sixty months.[2] The Plan defines "mental illness" as

> a disease that is commonly understood to be a mental or emotional disorder, as defined in the most recent edition of the <u>American Psychiatric Association Diagnostic and Statistical Manual</u>, whether or not it has a physiological or organic basis, and for which treatment is generally provided by, or under the direction of, a mental health professional such as a psychiatrist, psychologist or psychiatric social worker . . .

This definition includes alcoholism and drug abuse, schizophrenia, bipolar disorder, pervasive mental development disorder, panic disorder, major depression, psychotic depression, post-traumatic stress disorder, multiple personality disorder, or obsessive compulsive disorder.

The Plan requires that an employee provide proof of "total disability" by submitting certain forms no later than one year

---

[2]This sixty month limitation applies to employees, such as Altenburg, who served between five and twenty years at Monumental.

### ORDER GRANTING DEFENDANT'S MOTION FOR
### AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

after the date of disability. An employee who is awarded benefits is also required to apply to the Social Security Administration ("SSA") for Social Security Disability Insurance ("SSDI"). Upon receipt of SSDI, the Plan reduces the amount of its LTD payments to the employee accordingly.

### C.   Altenburg's Application for Benefits Under the Plan

In support of Altenburg's application for benefits, Dr. Joseph submitted the Plan's "Disability Determination Summary Form," which indicated that Altenburg suffers from "severe depression, anxiety - impacting on angina and heart disease. . . . coronary artery disease, chest pain and suicidal ideations," and further stated that he requires medication and psychological therapy for his severe emotional and physical limitations. Upon receipt of Altenburg's application, the Plan requested an Independent Medical Evaluation ("IME") from Dr. Martin Buda ("Dr. Buda"), a psychiatrist. On January 21, 1997, Dr. Buda diagnosed Altenburg with "generalized anxiety disorder with features of depression" and "anxiety affecting cardiac and cardiovascular illness." He concluded that "the magnitude and severity of affective/anxious symptomatology and its relation to cardiovascular illness in this patient precludes employment." Subsequently, the Plan approved Altenburg for LTD benefits, effective May 24, 1997.

6

**ORDER GRANTING DEFENDANT'S MOTION FOR**
**AFFIRMANCE OF ADMINISTRATIVE DETERMINATION**

### D.  The Plan's Yearly Review of Altenburg's Case

Two years later, Altenburg's diagnoses reflected coronary artery disease, anxiety, severe depression, chest pain, nervousness, occasional insomnia and glaucoma.  Altenburg applied for SSDI, but the SSA denied his request.  He continued to receive the Plan's LTD benefits and appealed the SSA's decision to the SSA Appeals Council.  Around this time, on December 9, 1999, Altenburg received a letter identifying Life Insurance Company of North America ("LINA") as the new administrator of the Plan, effective January 1, 2000.

In 2000, Altenburg began suffering from daytime sleepiness and received a diagnosis of mild obstructive sleep apnea.  He also developed left leg pain and began taking medication for claudication.  On May 9, 2000, when Altenburg's eligibility for the Plan's LTD benefits came up for yearly review, a LINA Disability Management Specialist determined that Altenburg's available records demonstrated adequate documentation of permanent mental and physical disabilities.  The Plan decided to continue his benefits, receive annual update clinical reports from his psychiatrist, cardiologist and primary care physician and to consider ordering an IME if Altenburg's SSA appeal proved unsuccessful.

In August of 2000, an angiogram of Altenburg's peripheral arteries revealed an ulcerated plaque in his left common femoral

7

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

artery.  On August 28, 2000, doctors successfully dilated the
artery by performing a balloon angioplasty of the left common iliac
artery with two stents placed due to peripheral vascular disease.
Subsequently, Altenburg continued receiving treatment from Dr.
Joseph, who indicated that Altenburg's condition continued to
improve and that he did not suffer from chest pain or significant
claudication symptoms.  She encouraged Altenburg to gradually
increase his activity and ambulate further distances.

In January of 2001, the SSA Appeals Council denied Altenburg's
appeal; however, Altenburg filed a new claim with the SSA in
February of 2001 and ultimately received an award of SSDI in the
spring of 2001.  When the Plan received notice of Altenburg's SSDI
award, it contacted his cardiologist and psychologist to assess his
current condition.  At this time, one of Altenburg's physicians,
Dr. Shah, completed a form on which he described Altenburg's
present physical condition as "stable" and found his physical
impairment to be a "Class 4 - Moderate limitation of functional
capacity; capable of clerical/administrative (sedentary) activity
(60-70%))."  Although Dr. Shah concluded that Altenburg would
benefit from further rehabilitative services, he could not comment
on Altenburg's mental or nervous impairments.

On April 25, 2001, however, Altenburg's psychologist, Dr.
Colvin, submitted the same form to the Plan, in which he diagnosed

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

Altenburg with "major depression," found Altenburg's mental impairment to be a "Class 4 – Patient is unable to engage in stress situations or engage in interpersonal relations (marked limitations)," and concluded that he is "unable to return" to work. Subsequently, the Plan continued Altenburg's benefits; however, it adjusted the amount of its monthly payments to Altenburg and his dependants due to Altenburg's SSDI award.

When Altenburg's claim came up for yearly review in 2002, he informed the Plan that he is unable to work due to chest pain, weakness, stress and difficulty sleeping. The Plan requested medical information from Dr. Joseph and sent a request to Dr. Reddy to determine Altenburg's cardiac status. On August 13, 2002, Dr. Joseph completed a diagnosis specific letter and Physical Abilities Assessment ("PAA"), which diagnosed Altenburg with coronary artery disease, peripheral vascular disease and bipolar disorder. The form further instructed Dr. Joseph to indicate Altenburg's current functional level. Given a selection of "Sedentary work," "Light work," "Medium work," and "Heavy work," and directed to "check all that are applicable," Dr. Joseph selected "Sedentary work." She noted Altenburg's ability to continuously sit, perform simple grasping, use lower extremities to operate foot controls, frequently stand, perform fine manipulation and firm grasping; occasionally lift, carry, push and pull up to fifty pounds; walk,

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

climb regular stairs and ladders, balance, stoop, kneel, crouch and crawl, and reach overhead to desk level or below the waist. According to a March 11, 2002, office note, Altenburg also had stopped smoking and started exercising, though exercise caused him to experience some leg pain.

LINA submitted the medical information reported by Dr. Joseph to Dr. Marion Reznick ("Dr. Reznick"), a rehabilitation specialist. Dr. Reznick completed a Transferable Skills Analysis ("TSA") and concluded that Altenburg has the ability to perform the necessary functions of several sedentary jobs, such as sales manager, branch manager, or management trainee. On January 14, 2003, the LINA case manager faxed requests to Dr. Joseph and Dr. Reddy, advising them of Dr. Reznick's TSA and asking them to comment on whether they agreed that Altenburg possessed the capacity to perform sedentary work based on his current cardiac and physical conditions.

On January 14, 2003, Dr. Reddy found Altenburg "able to do Sedentary work from a cardiac point of view." He further stated in a letter to Dr. Joseph that "the patient has been doing reasonably well from a cardiac point of view. The patient does go to the YMCA and has been walking. He denies any chest pain, PND, or orthopnea." On January 28, 2003, Dr. Joseph also found Altenburg capable of performing sedentary work, and signed the LINA request form indicating as much. Both doctors also provided documentation

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

indicating that medication stabilizes and controls Altenburg's

coronary artery disease, peripheral vascular disease and bi-polar

disorder.  The Plan then consulted with Dr. Colvin, who documented

the partial remission of Altenburg's major depression.    As

a consequence of this information from Altenburg's health care

providers, on January 30, 2003, the Plan found no evidence to

support "that a physical condition(s) and/or mental illness is

causing any severe functional and/or psychiatric impairment(s)

preventing [Altenburg] from performing Sedentary work and returning

to gainful employment."  Thus, because he no longer met the Plan's

definition of "total disability," the Plan discontinued Altenburg's

benefits and selected four "Sedentary" occupations for him that

exceeded gainful wage criteria.    LINA sent Altenburg a letter

informing him of its decision on Feburary 14, 2003.  Subsequently,

Altenburg appealed the Plan's decision.

### E.    Altenburg's Appeal of the Plan's Discontinuation of His Benefits

In support of his appeal, Altenburg submitted reports from Dr.

Colvin, which indicated that work is too stressful for Altenburg,

and a letter from Dr. Joseph, which states that Altenburg is unable

to engage in stressful situations or interpersonal relations and

cannot maintain a forty-hour work week.  Dr. Colvin commented:

> While it's true [that Altenburg] is not
> currently having major symptoms of his

11

**ORDER GRANTING DEFENDANT'S MOTION FOR**
**AFFIRMANCE OF ADMINISTRATIVE DETERMINATION**

> depressive disorder it's also true that he's
> currently experiencing very minimum stress.
> . . . He would not be able to function in the
> work environment. . . . The best that we can
> hope for, as an outcome for Mr. Altenburg is
> that we maintain some level of activities of
> daily living and minimize the occurrences of
> his mood disorder exacerbations . . . .

Upon receipt of this information, LINA requested that Dr. I.
Jack Abramson ("Dr. Abramson"), a psychiatrist, and Dr. Stuart
Snyder ("Dr. Snyder"), a board-certified internist with a
background in cardiovascular disease, review Altenburg's records.
Dr. Abramson concluded that there is no medical evidence to support
a claim that Altenburg is incapable of performing sedentary work,
and Dr. Snyder found Altenburg at least capable of performing light
duties, noting that all of the doctors' evaluations in Altenburg's
record indicate that he is "stable for sedentary work."
Consequently, on June 4, 2003, LINA denied Altenburg's appeal,
stating that ". . . the records on file regarding your medical
conditions indicate that although you have some
limitations/restrictions you have been entirely stable for over a
year. . . . [T]he weight of the medical evidence in your claim file
supports your ability to perform Reasonable Occupations . . . ."
Altenburg appealed this decision to the AEGON U.S.A. Welfare
Benefits Committee (the "Committee").

## F.    Plaintiff's Appeal to the AEGON Welfare Benefits Committee

In reviewing Altenburg's appeal, the Committee presented his medical records to Dr. Theodore Pearlman ("Dr. Pearlman"), a Diplomate of the American Board of Psychiatry and Neurology and general medical practitioner, and to Dr. Arnold Meshkov ("Dr. Meshkov"), a cardiologist, for independent review.  After reviewing these records and speaking with Dr. Reddy and Dr. Colvin, Dr. Pearlman found Altenburg mentally and physically capable of performing sedentary work.  He concluded that there was no medical evidence that Altenburg currently suffers from congestive heart failure, angina or severe dyspnea and, further, that "Major Depression is treatable with antidepressive medications and psychotherapy" and "the vast majority of patients with Major Depression maintain full-time work status while receiving outpatient psychiatric treatment."  Dr. Meshkov reached the same conclusion, finding "no indication in the recent records that [Altenburg] is having significant angina that would preclude full-time employment in a sedentary occupation."

Altenburg subsequently wrote letters to Dr. Pearlman and Dr. Meshkov, in which he disputed their findings and stated, "[i]n my plan after 5 years any mental problems are no longer covered" and questioned whether stress, which causes one to be upset or sick, and sleep apnea are more difficult for people struggling with heart

13

disease. Altenburg submitted these letters to the Committee and also submitted a letter written to Dr. Joseph by his neurologist, Dr. Navada, on June 21, 2003. Dr. Navada's letter diagnoses Altenburg with "day time somonolence/period limb movements of sleep," cluster headaches and depression, and further indicates that, because Altenburg has multiple risk factors for cardiovascular disease, Altenburg should be encouraged "to be as active as possible."

After reviewing the record, on February 4, 2004, the Committee denied Altenburg's appeal on the grounds that he is physically capable of performing sedentary work and, therefore, does not meet the Plan's definition of "total disability." It further found that, if Altenburg is unable to perform sedentary work, it is due to mental illness, a type of disability for which he is no longer entitled to benefits under the Plan.

Altenburg now asks this Court to declare the Committee's denial of his benefits unreasonable and reverse its decision. According to him, the administrative record reflects that he is medically, not mentally, disabled and cannot work due to severe heart disease. The Committee, however, argues that ample evidence exists to support their decision that Altenburg is physically capable of performing certain jobs and that mental illnesses, i.e., his anxiety and depression, prevent him from doing so.

**ORDER GRANTING DEFENDANT'S MOTION FOR
AFFIRMANCE OF ADMINISTRATIVE DETERMINATION**

### II. STANDARD OF LAW

A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). In considering a motion for summary judgment, the court is required to draw reasonable inferences from the facts in a light most favorable to the nonmoving party. Id. at 255.

The moving party has the burden of initially showing the absence of a genuine issue concerning any material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to "establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings but instead must have evidence showing that there is a genuine issue for trial. Id. at 324.

**ORDER GRANTING DEFENDANT'S MOTION FOR
AFFIRMANCE OF ADMINISTRATIVE DETERMINATION**

### III. LEGAL ANALYSIS

## 1.    Standard of Review

The Plan is an employee benefit plan within the meaning of the
Employee Retirement Income Security Act ("ERISA").  See 29 U.S.C.
§§ 1002-1003 (2000).  Where, as here, the plan administrator or
fiduciary has discretionary authority to determine eligibility for
benefits, the Court examines the administrative record using an
abuse of discretion standard.  See McCoy v. Holland, 364 F.3d 166,
170 (4th Cir. 2004); Booth v. Wal-Mart Stores, Inc. Associates
Health & Welfare Plan, 201 F.3d 335, 341 (4th Cir. 2000);  Sheppard
& Enoch Pratt Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 123-
24 (4th Cir. 1994) (citing de Nobel v. Vitro Corp., 885 F.2d 1180,
1186-87 (4th Cir. 1989)).  Under this standard, the Court must
uphold the Committee's decision so long as it is reasonable.[3]  See
McCoy, 364 F.3d at 170;  Elliott v. Sara Lee Corp., 190 F.3d 601,
605 (4th Cir. 1999) (quoting Brogan v. Holland, 105 F.3d 158, 161
(4th Cir. 1997)).

---

[3]As evidence that the Committee's determination is
unreasonable, Altenburg submitted documents that are not part of
the record reviewed by the Committee.  Moreover, his briefing
references events that took place subsequent to the completion of
the administrative appeal process.  As a matter of law, this
information cannot be considered by the Court because it is outside
the scope of the administrative record.  Sheppard & Enoch Pratt
Hosp., Inc. v. Travelers Ins. Co., 32 F.3d 120, 124 (4th Cir.
1994).

**ORDER GRANTING DEFENDANT'S MOTION FOR
AFFIRMANCE OF ADMINISTRATIVE DETERMINATION**

A reasonable decision is one that is supported by substantial evidence. See McCoy, 364 F.3d at 170; Elliot, 190 F.3d at 605. The fact that substantial evidence also exists to support a contrary position does not impact the Court's determination. See Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 619 (1966); LeFebre v. Westinghouse Elec. Corp., 747 F.2d 197, 208 (4th Cir. 1984); Hamrick v. Schweiker, 679 F.2d 1078, 1082 (4th Cir. 1982).

## IV. DISCUSSION

At bottom, Altenburg's dispute lies with the propriety of the Committee's decision to classify his mental illnesses as "mental" and to ignore the risk that the increased psychological stress of returning to work will adversely affect his otherwise stable but serious heart condition. Moreover, he asserts that the Plan never before applied the provisions of the SPD relating to disabilities based on "mental illness" in his case. Nevertheless, a careful review of the record reviewed by the Committee establishes that there is substantial evidence to support a finding that Altenburg is capable of returning to work in a sedentary position and that, if he is unable to do so, it is a result of mental illness.[4]

---

[4]Altenburg also cites the Committee's decision to stop his benefits with only two weeks notice, and its failure to use the Rehabilitative Employment provision of the SPD, as examples of its unreasonableness. The Court's role in this case, however, is to review the Committee's decision to deny Altenburg's benefits, not to pass judgment on the reasonableness of the Plan's notice

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

### A.    Altenburg's Mental Illnesses

Although Altenburg does not deny the existence of his depression, stress, anxiety, sleep and other disorders, he argues that, because these disorders developed as a result of, and adversely impact, his heart condition, they should not be classified as mental illnesses.   According to the <u>American Psychiatric   Association   Diagnostic   and   Statistical Manual</u> ("DSMIV"), however, anxiety, depression and sleep disorders are "mental illnesses."   Am. Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders (4th ed., text revision, 2000).   Although these disorders may have resulted from and have an impact on Altenburg's heart condition, the Plan specifically states that it considers diseases defined as mental or emotional by the DSMIV to be "mental" illnesses, regardless of whether the diseases have a physiological or organic basis.   These diagnoses, therefore, provide substantial evidence that Altenburg does suffer

---

policies.   Moreover, the Rehabilitative Employment Program is a voluntary employee incentive program in which an employee may choose to participate.   It is an incentive feature of the Plan that allows employees who wish to return to full-time work more quickly to "attempt rehabilitation and not jeopardize 'total disability' status."   Under the terms of the SPD, employees are not required to participate in this program and the Plan is not required to suggest that they do so.   Further, Altenburg never raised LINA's failure to utilize the Plan's Rehabilitative Employment Program during the administrative process.

from mental illnesses.  Accordingly, because, under the terms of the Plan, Altenburg's eligibility for LTD benefits based on "mental illness" expired in 2002, five years after his initial approval for benefits, he can only continue to receive LTD benefits if his physical diseases meet the Plan's definition of "total disability." There is, however, substantial evidence that his mental illnesses, and not his physical illnesses, are responsible for his inability to return to work.

**B.    Altenburg's Ability to Perform Sedentary Work**

**1.    The Plan's Obligations Under the SPD**

Altenburg argues that, given his long history of heart problems, the Committee acted unreasonably in determining that he is no longer medically disabled based on improvements in his condition made over a one year period.  He further insists that it is unreasonable to characterize a medical condition as "stable" when the only way to control that condition is through the consumption of numerous amounts of prescription medications.

The SPD, however, permits the Plan to request proof that an employee continues to suffer from a "total disability" at any time during the first twenty-four months of disability and once a year subsequent to the first twenty-four months.   There are no provisions that require the Plan to allow an employee to remain on disability if his condition can only be stabilized through the use

19

of medication or if his condition has only been stable for a short period of time.  In point of fact, in a case such as Altenburg's, the Plan's only obligation is to determine whether, at the time of review, the employee is able to perform *any* occupation which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, physical or mental capacity.  This is precisely what the Committee did when it reviewed the record to determine whether Altenburg is no longer eligible for LTD benefits.  Thus, there is substantial evidence that it acted reasonably in reaching its determination that he did not.

### 2.  Evidence that Altenburg is Physically Capable of Returning to Work

According to Altenburg, the Committee approved his application for LTD benefits solely because of his severe heart disease. However, Altenburg applied for LTD benefits on the basis of Dr. Joseph's diagnosis of "severe depression, anxiety – impacting on angina and heart disease."  Moreover, the Plan ultimately approved his application in 1997 after Dr. Buda, a psychologist, conducted an IME of Altenburg and diagnosed him with "generalized anxiety disorder with features of depression" and "anxiety affecting cardiac and cardiovascular illness."  From 1997 forward, the Plan monitored Altenburg's condition from both a physical and a

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

psychological perspective, requesting updated information and analyses from physicians, cardiologists and psychologists. Each year, the Plan continued his benefits after confirming with his physicians that his mental and physical illnesses remained disabling.

The Plan received its first indication that Altenburg's physical condition had stabilized in 2001, when Dr. Shah found him physically capable of sedentary work. Nevertheless, it continued his benefits after Dr. Colvin found Altenburg incapable of returning to work from a psychological perspective. In 2002, however, when Altenburg's eligibility for LTD benefits based on "mental illness" expired, the Plan sought advice from Drs. Joseph, Reddy and Colvin, and ordered independent medical and psychological evaluations of Altenburg's medical records, to determine whether any of Altenburg's disabilities entitled him to continue receiving benefits.

The Committee also requested additional independent evaluations of Altenburg's medical records from Dr. Pearlman, who consulted with Dr. Reddy and Dr. Colvin before reaching his ultimate determination, and Dr. Meshkov in reviewing Altenburg's appeal. Each of these health care providers determined that

**ORDER GRANTING DEFENDANT'S MOTION FOR
AFFIRMANCE OF ADMINISTRATIVE DETERMINATION**

Altenburg was capable of performing sedentary work.[5]  Dr. Colvin even reported Altenburg's major depression was in partial remission.  Further, Dr. Reddy found that Altenburg was "capable of performing sedentary work from a cardiac perspective;"  Dr. Navada encouraged Altenburg to be more active;  and, significantly, Dr. Joseph specifically selected "sedentary work" as Altenburg's functional level on the PAA she submitted to the Plan in August of 2002, even though the instructions did not require her to indicate a functional level if none applied.  There is also evidence that Altenburg stopped smoking, began going to the YMCA and engaged in activities at home with his wife and newborn child.

---

[5]Altenburg argues that Dr. Joseph used the term "sedentary" on the PAA she submitted to the Plan in a different context than Dr. Reznick did on her TSA.  Thus, according to him, because the doctors consulted by the Committee used Dr. Reznick's TSA to analyze his case, the Committee's finding that his health had improved enough to return to sedentary employment is unreasonable. The doctors consulted by the Committee, however, reviewed Altenburg's case by examining his entire medical record, including Dr. Joseph's diagnoses.  Further, the record is devoid of any evidence that Dr. Reznick and Dr. Joseph used the term "sedentary" differently.  In point of fact, Dr. Joseph signed LINA's request form, on which she agreed that Altenburg is capable of performing sedentary work, *after* the Plan informed her of Dr. Reznick's TSA. Although Dr. Joseph later reported that she believes Altenburg is incapable of working a forty-hour week, she based her conclusion in part on his inability "to engage in stress situations or interpersonal relations."  Thus, even if Dr. Joseph and Dr. Reznick had subconsciously defined the term "sedentary" differently, there is substantial evidence in the record to support an objective finding to the contrary.

### ORDER GRANTING DEFENDANT'S MOTION FOR
### AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

Although Dr. Joseph and Dr. Colvin later wrote to the Plan in support of Altenburg's appeal, Dr. Joseph based her new opinion that Altenburg is not capable of working a forty-hour week in part on Altenburg's inability "to engage in stress situations or interpersonal relations." Similarly, Dr. Colvin stated that "[t]he best that we can hope for, as an outcome for Mr. Altenburg is that we maintain some level of activities of daily living and minimize the occurrences of his mood disorder exacerbations."

His ability to receive benefits based on these mood disorders, however, expired in 2002. Further, after receiving Dr. Pearlman and Dr. Meshkov's opinions, Altenburg wrote each a letter conceding that "[i]n my plan after 5 years any mental problems are no longer covered," and questioning whether stress, which causes one to be upset or sick, and sleep apnea, are more difficult for people struggling with heart disease. Altenburg also wrote a message to the Committee on the front of a document in the record that outlines the sedentary occupations selected for him by the Plan.[6] This message disputes his ability to perform the occupations outlined and states, "Did anyone read the report for how I deal with people?"

---

[6]These occupations included Contact Administrator, Compliance Officer, Commercial-Instructor Supervisor and Director of Funds Development

## ORDER GRANTING DEFENDANT'S MOTION FOR
## AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

This writing and the letters to Dr. Pearlman and Dr. Meshkov indicate that Altenburg realizes that his mental health issues prevent him from returning to work, despite his dispute over the propriety of classifying those illnesses as "mental." As noted previously, because these illnesses are defined as mental or emotional by the DSMIV, under the Plan's terms it is irrelevant whether they stem from Altenburg's heart condition. Ultimately, therefore, the Committee, faced with substantial evidence that Altenburg's inability to work is grounded in his mental illnesses, acted reasonably when it affirmed the discontinuation of his benefits.

### IV.   CONCLUSION

Because there is no material question of fact that there is substantial evidence to support the Committee's denial of Altenburg's benefits, the Court **GRANTS** the defendant's motion for affirmance of administrative determination (dckt. no. 21) and **DISMISSES** the plaintiff's case **WITH PREJUDICE.**

It is so **ORDERED.**

**Altenburg v. Commonwealth General**                    **1:04CV59**

### ORDER GRANTING DEFENDANT'S MOTION FOR
### AFFIRMANCE OF ADMINISTRATIVE DETERMINATION

The Clerk is directed to transmit copies of this Order to counsel of record and <u>pro se</u> plaintiff.

DATED: May _____6_____, 2005.


IRENE M. KEELEY
UNITED STATES DISTRICT JUDGE